ON RETURN TO REMAND
At the direction of the Supreme Court, 509 So.2d 1064 we remanded this cause to the trial court for proceedings consistent with the Supreme Court opinion, 509 So.2d 1067. The Supreme Court stated:
 "The defendant may be able to show that the evidence, if timely disclosed, would have been exculpatory. Because of the doubt created by the belatedly disclosed police report, and because this is a case involving the death penalty, we believe justice would be served by allowing Watkins to show, if he can, that the belatedly disclosed police report 'substantially affected' his right to a fair trial. In the event the trial judge finds that Watkins' rights were 'substantially affected,' Watkins is entitled to a new trial. If the trial judge finds otherwise, he should make findings of fact accordingly and promptly report those to the Court of Criminal Appeals."
The trial court has made findings of fact, in considerable detail; a complete copy of its findings is attached and made a part of this opinion.
The further investigation revealed that nothing about the police officer's report could be substantiated. The court, in its findings, stated that defendant Watkins was identified by three witnesses at his trial as being one of the men who robbed Eugster's Market and as the murderer of Milton Mayfield, and said, "The record of trial is clear as to the opportunity each had to view the defendant at the scene of the crime. Their in-court identification of the defendant was positive and unequivocal." The trial judge then said:
 "Based on these facts, the following additional findings of fact are made:
 25. The person purporting to be Johnny Jackson, who gave information to Officer Borella on December 28, 1980, was not in truth named Johnny Jackson and the information he provided was false.
 26. The James Johnson and Bobby Brown who were alleged by the purported Jackson to be the persons responsible for the Eugster's Market robbery did not exist and did not commit that robbery.
 27. The appellant's defense would not have been helped by having Officer Borella's report in their possession earlier than they received it.
 28. The belated disclosure of the police report did not substantially affect Darryl Travis Watkins' right to a fair trial and did not affect the outcome of the appellant's trial."
We agree further that the identification of Watkins as the killer of Mayfield constitutes overwhelming evidence of guilt. This case is due to be affirmed.
AFFIRMED.
All the Judges concur.
 IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA CASE NO. CC 81-937 (SC82-1190) FINDINGS OF FACT
This case was remanded for this Court to answer the following question: Did the belated *Page 1069 
disclosure of a police report "substantially affect" Darryl Travis Watkins' right to a fair trial?
At the hearing on this question a stipulation of fact agreed upon by the parties was submitted to the Court. Subsequently a "second stipulation" of fact was also submitted. The parties agreed that the facts set forth in these stipulations are true and correct.
Having considered the evidence presented by stipulation of fact and as the trial judge in this case, having considered the entire record of trial in this case, the Court makes the following findings of fact:
1. On December 28, 1980, a 21-year-old black male, who gave his name as Johnny Jackson, provided Birmingham police officers John Borella and Jeff Sartain with information concerning the Eugster's Market robbery. He told the officers that he had overheard conversations between and about two persons named, Bobby Brown and James Johnson, who both reside at 708 Lawn Avenue, which indicated that they had robbed Eugster's Market. The purported Jackson told the officers that he was living at Room 25 in the Chesterfield Motel and that his phone number was 979-9922. He also told them that he went to Woodlawn High School and that he was in Mr. Sander's eleventh grade homeroom.
2. The Chesterfield Motel is an inexpensive motel with some residents who occupy rooms for only a few days at a time and with other residents who may occupy a room for months or more at a time.
3. Chesterfield Motel guest registration records show that no one named Johnny Jackson, Bobby Brown, or James Johnson was ever registered there during 1977 through 1980. The manager and clerk of the Chesterfield Motel, both of whom were with the motel in 1980, state that no one named Johnny Jackson, Bobby Brown, or James Johnson ever registered there.
4. No young black male resided in room number 25 of the Chesterfield Motel in 1980.
5. The Chesterfield Motel's telephone number was in 1980 and still is 798-9922. The Chesterfield Motel's telephone number was not in 1980 and has never been 979-9922. That telephone number, 979-9922, was in 1980 and is now registered to a white male resident of Hoover, Alabama, with no connection to this case.
6. No one named Johnny Jackson, Bobby Brown, or James Johnson was enrolled in Woodlawn High School in or around 1980. A John Jackson, born on June 9, 1961, was enrolled in Woodlawn High School from September of 1975 until June of 1977. School records indicate that his address was 1309 Sixth Street North in Birmingham.
7. Woodlawn High School has never had an employee or teacher named Mr. Sanders.
8. Woodlawn Community School is an adult vocational night school operated on the premises of Woodlawn High School. No high school credits are awarded for course work. There is no eleventh grade and there are no home rooms.
9. There has never been a teacher named Sanders associated with Woodlawn Community School.
10. The school's records do not show that any students named Johnny Jackson, James Johnson, or Bobby Brown were ever enrolled as students at Woodlawn Community school.
11. There was not in 1980 and there is not now any such address as 708 Lawn Avenue. Lawn Avenue addresses run from numbers 2400 to 3025. 12. Except for Officer Borella's report, the names Johnny Jackson, Bobby Brown, and James Johnson do not appear in any Birmingham Police Department files and records.
13. No past or present member of the Crimes Against Persons Unit of the Birmingham Police Department presently *Page 1070 
recalls hearing any of those three names before.
14. After writing out his report, Officer Borella, in the ordinary course of Birmingham Police Department procedure, would have turned the report into his patrol supervisor, who would have sent the report from his precinct headquarters to the records unit of the Police Department. The Records Unit, in the ordinary course, would have made a copy of the report. The original of the report would have been kept by the Records Unit for microfilming, and a copy would have been sent to the Crimes Against Persons Unit. At the Crimes Against Persons Unit, the copy of the report would have been given to Sergeant Albert Wallace, the investigator assigned to the Eugster's Market robbery.
15. Although no one in that channel of paperwork, other than Officer Borella and Sergeant Wallace, remembers seeing Officer Borella's report, there is no reason to believe that the report was not handled according to ordinary procedure through departmental channels.
16. Sergeant Wallace did receive the copy of Officer Borella's report. Although the exact date he received the report is unknown, it is known that the copy of the report which Sergeant Wallace received was made by the Records Unit on or before January 15, 1981. In the ordinary and usual course of police department business, it would not have taken longer than two weeks for a report to go from a patrolman such as Officer Borella through channels to an investigator such as Sergeant Wallace who was in charge of the case.
17. A copy of Officer Borella's report was in the original police department file and in a file in the possession of Sergeant Wallace.
18. Neither appellant nor his attorney was given a copy of Officer Borella's report until the first day of trial.
19. At appellant's trial one of the two assistant district attorneys prosecuting the case produced Officer Borella's report.
20. The events which occurred after the assistant district attorney produced the report were transcribed as part of the record in the appellant's trial.
21. The parties have cooperated in every effort to discover all possible information concerning Officer Borella's report. An investigator for the Alabama Attorney General's office has been assigned to the task. He spent more than five full days in July of 1983 investigating the matter. All the information he has uncovered has been shared with appellant's attorneys.
22. Neither party has uncovered any evidence that the information contained in Officer Borella's report was investigated prior to July of 1983.
23. There is no evidence to indicate that further investigative efforts in regard to this report would be productive.
24. At his trial, defendant Watkins was identified by three witnesses as being one of the men who robbed Eugster's Market and as the murderer of Milton Mayfield. The record of trial is clear as to the opportunity each had to view the defendant at the scene of this crime. Their in court identification of the defendant was positive and unequivocal.
Based on these facts, the following additional findings of fact are made:
25. The person purporting to be Johnny Jackson, who gave information to Officer Borella on December 28, 1980, was not in truth named Johnny Jackson and the information he provided was false.
26. The James Johnson and Bobby Brown who were alleged by the purported Jackson to be the persons responsible for the Eugster's Market robbery did not exist and did not commit that robbery.
27. The appellant's defense would not have been helped by having Officer Borella's report in their possession earlier than they received it.
28. The belated disclosure of the police report did not substantially affect Darryl *Page 1071 
Travis Watkins' right to fair trial and did not affect the outcome of the appellant's trial.
The clerk of the court is ORDERED to report these findings to the Court of Criminal Appeals.
DONE and ORDERED this the 8th day of June, 1984.
 s/ Dan Reynolds ------------ DAN REYNOLDS CIRCUIT JUDGE