**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Keith DEERMAN and Francis G.**
**Kinney, Defendants-Appellants.**

No. 87-3033.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1988.

---

Robert Glass, Arthur A. Lemann, III, New Orleans, La., for defendants-appellants.

Patty Merkamp Stemler, Atty., Dept. of Justice, Crim. Div./Appellate Section, Washington, D.C., for plaintiff-appellee.

Before CAROLYN DINEEN KING[*] and DAVIS, Circuit Judges, and PARKER[**], District Judge.

W. EUGENE DAVIS, Circuit Judge:

Appellants and others were tried on multiple charges relating to a scheme to introduce a large quantity of marijuana into the country. The jury acquitted appellants on two counts of the indictment and failed to agree on two other counts. The government then filed a superceding indictment against appellants that appellants sought to dismiss on grounds of double jeopardy and collateral estoppel. The district court denied appellants' pretrial motions to dismiss. We affirm.

## I.

In reviewing the district court's ruling on appellants' motions we consider the facts developed at appellants' trial in a light most favorable to the government. *See United States v. Mulherin*, 710 F.2d 731 (11th Cir.), *cert. denied sub nom. Moore v. United States*, 464 U.S. 964, 104 S.Ct. 402, 78 L.Ed.2d 343 (1983), and *Hornsby v. United States*, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 703 (1984); *United States v. Seijo*, 537 F.2d 694 (2d Cir.1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977).

Appellants, Keith Deerman and Francis G. Kinney, were employed as United States Customs agents in charge of the marine

[*] Formerly Carolyn Dineen Randall.

[**] District Judge of the Eastern District of Texas, sitting by designation.

operations in the New Orleans area. In June 1985, a former Customs agent, Sam Edwards, contacted his old friends, Kinney and Deerman, and sought their assistance in arranging the importation of more than 50,000 pounds of marijuana. At the initial meeting, the three men discussed the logistics of importing the marijuana, the payment, the availability of an offloading site, and the need to have Customs agents check names of individuals and vessels on the Treasury Enforcement Communication System (TEC) computer. According to Edwards, who was the government's star witness, both Kinney and Deerman agreed to assist in the criminal enterprise.

Randy Fink was the ringleader. His partner, Tony Varca, supplied the ships and the crew. Sam Edwards was charged with locating a suitable site to unload the marijuana and obtaining the assistance of Customs agents in the area where the marijuana was to be landed. The total value of the shipment was approximately eighteen million dollars. The profits were to be divided into three equal shares: one third was to go to Fink and Varca, another share to the Colombian suppliers, and the remaining third to Edwards and the Customs agents chosen by Edwards to assist in the undertaking. According to Edwards, one of the major reasons the New Orleans area was selected as the site to land the marijuana was his close contact with Deerman and Kinney. Fink, who also cooperated with the government at trial, testified that New Orleans was selected because Edwards and his New Orleans agents "had more control" over their area than the South Florida agents whom he had contacted.

Kinney and Deerman lent substantial support and assistance to the efforts to land the marijuana in the New Orleans area.

### A. Selection of a Site to Unload the Marijuana

Fink asked Kinney and Deerman to recommend a safe waterfront site to unload the marijuana. Kinney and Deerman initially suggested Michael Mayer's boat maintenance and repair facility as an unloading site. Deerman and Kinney knew Mayer because they had sent Customs service vessels to Mayer's yard for repairs. After Mayer declined Edwards' offer of $100,000 for use of his repair yard, Kinney accompanied Edwards to other possible offloading sites. Based on Kinney's advice, Varca purchased riverfront property for $600,000 for the unloading site. When appellants learned that a confidential informant had advised the FBI about the possible use of this site or one in that immediate area for unloading a large amount of marijuana, appellants warned Edwards and Fink about this tip and advised against use of this site. Fink and Edwards then instructed appellants to find a new site to unload the marijuana. Appellants next suggested an abandoned riverfront warehouse in Dulac, Louisiana, that had once been seized by the U.S. Customs Service. Although appellants showed Edwards the suggested warehouse in Dulac, when Edwards attempted to drive Fink to the warehouse he lost his way and telephoned Kinney for directions. Fink approved the warehouse as an unloading site and sent the men he had hired as truck drivers (who turned out to be undercover FBI agents) to the warehouse to make repairs before the marijuana arrived.

### B. Sharing with the Smugglers Information in the TEC Computer and Other Law Enforcement Intelligence

Fink and Varca used three ships to transport the marijuana from Colombia to New Orleans: the MACVIE, the BLUE STAR, and the ISLAND VENTURER. At Edwards' request, Kinney ran the names of these three ships through the TEC computer. He told Edwards that both the BLUE STAR and the ISLAND VENTURER were on the Customs "hot list." With this information, Fink and Varca used the BLUE STAR to make the first leg of the trip from Colombia to a point near Jamaica where the crews transferred the marijuana to the MACVIE. As the vessels neared New Orleans, the BLUE STAR and the ISLAND VENTURER acted as decoys while the

MACVIE steamed toward the unloading site.

Appellants also diverted at least one Customs agent away from the warehouse in Dulac where the trucks waited to receive the marijuana.

On August 18, the FBI agents working undercover as truck drivers took the U-haul trucks to the Dulac warehouse to await the arrival of the marijuana. On the following day, a Customs agent received a tip from the local sheriff's office that three U-haul trucks were at the deserted warehouse in Dulac. When this information was transmitted to appellants, Kinney telephoned Edwards and told him "that all hell had broken loose and that the State Police had seen us go in that night or early that morning, ... and that it was imperative to get all the vehicles out of the warehouse, but I [Edwards] was not to go back under any circumstances." Deerman ordered surveillance of the trucks and directed the surveilling agents to obtain the names of the truck drivers from hotel desk clerks where they were directed to register as well as any telephone numbers the drivers might dial. Deerman eventually passed all of this information along to Edwards.

The FBI ultimately realized that someone was leaking information to the smugglers, and on August 20 the agents arrested a number of the participants in the smuggling scheme, including Fink. The United States Coast Guard seized the marijuana in the Gulf of Mexico, where it was being transferred from the MACVIE to shrimp boats for transportation to the Dulac warehouse. Fink had Kinney's phone numbers with him at the time of his arrest, and when the agents searched Deerman's office they found his notes of locations and phone numbers of the three truck drivers/FBI agents and a blueprint of the Dulac warehouse.

## II.

Appellants Kinney and Deerman were indicted, along with twenty-five other defendants, in a four count indictment charging them as follows: conspiracy to import marijuana in violation of 21 U.S.C. §§ 952 and 963 (Count 1); attempted importation of marijuana in violation of 21 U.S.C. §§ 952 and 963 (Count 2); conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 3); and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 955 (Count 4).

Following the trial, the jury deliberated for approximately six hours and announced that it had reached a verdict. The jury foreman delivered a completed verdict form to the court which reflected that the jury found appellants not guilty on the possession counts (Counts 3 and 4) and guilty on the importation counts (1 and 2). When the court polled the jury, however, two of the jurors announced that they did not concur in the convictions of appellants on Counts 1 and 2. Counsel for Deerman immediately moved for a mistrial, which the court denied. No counsel asked the court to retire the jury for further deliberations. The district court ordered the verdicts recorded and later received and considered appellants motions for a new trial. The government offered no opposition to these motions and the district court granted appellants' motions for a new trial on Counts 1 and 2.

Following these developments, the grand jury handed down a superceding indictment charging appellants with conspiracy to import marijuana and attempt to import marijuana in substantially the same form as the earlier indictment. Additionally, the grand jury charged Deerman with three counts of using the telephone to facilitate the importation offenses in violation of 21 U.S.C. § 843(b) and Kinney with two counts of using the telephone to facilitate the importation offenses. These charges are predicated on the telephone calls Kinney made to Edwards giving him directions to the Dulac warehouse and telephone calls Deerman made to warn Edwards about the surveillance being conducted on possible unloading sites.

Kinney and Deerman both testified at the trial and admitted making the telephone calls. They denied, however, that they knew that Edwards was planning to

import marijuana into the country or that the information they transmitted to him could be of any assistance in any such scheme.

The defendants moved to dismiss all counts of the superceding indictment on the following grounds. First, the government is barred from retrying defendants on Counts 1 and 2—the importation counts— because the district court did not give the jury a fair opportunity to reach a unanimous verdict. It aborted the trial without the consent of the defendants or manifest necessity for doing so. Consequently, retrial of the defendants on the importation counts is barred by the double jeopardy clause of the fifth amendment. Second, based on collateral estoppel principles, the government is also barred from trying the defendants on Counts 3 through 7—use of the telephone to facilitate the importation. Trial on these counts is barred because the jury, in finding appellants not guilty of the possession counts, necessarily rejected the government's contention that the appellants made telephone calls to knowingly facilitate the importation of marijuana.

We will consider each argument in turn.

### III.

We consider first the appellants' argument that the government is barred from retrying the defendants on the importation counts in the superceding indictment because the district court did not give the jury a fair opportunity to reach a unanimous verdict.

After the jury foreman delivered the completed verdict form to the court announcing a guilty verdict against Deerman and Kinney on the two importation counts, the court polled the jury. When Juror No. 8 dissented from the verdict, Deerman's counsel immediately moved for a mistrial. The court denied Deerman's motion and continued to poll the jury. When the twelfth juror also dissented, Deerman's counsel again moved for mistrial. Kinney's counsel sat silent through the entire polling procedure. When the court completed polling the jury, it asked Juror No. 8, "And in what respect is it not your

verdict?" The juror responded in part, "I just can't deal with having someone's life in my hands." Although this juror admitted that she voted in favor of a guilty verdict in the jury room, she said she felt the defendants were "guilty of the counts but I can't say that. I can't honestly sit here and say he is guilty. I feel that, though." Although Juror No. 12 also admitted that she had voted for conviction in the jury room, she told the court that she wished to change her vote because, "In my heart, I feel like they are not guilty."

After the court finished polling the jury, two of the jurors who remained in favor of a guilty verdict made spontaneous remarks to the court which we interpret as an attack on the good faith deliberation of the dissenting jurors. Juror No. 9 stated, "I am sorry that I didn't come this morning and speak with you about it but I just think there are some people among us who ... did not ever explore the possibility of the other side and that they went in with their minds completely made up from the beginning." Juror No. 11 added, "That is absolutely right. I feel as though there are some people who had personal problems with this, who can't seem to look at all the evidence and bring their heart and their mind to thinking that they are sending somebody to jail...."

The district court then discharged the jury, recorded the verdict, and stated that "the court shall fashion its judgment based upon the jury's verdict." Appellants filed a timely motion for new trial on the importation counts; the government did not oppose the motion, and the district court granted it.

■ Our analysis begins with a consideration of the options available to the trial court when it discovered, upon polling the jury, that two of the jurors dissented from the verdict. Fed.R.Crim.P. 31(d) provides:

> When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be

directed to retire for further deliberations or may be discharged.

Thus the district court had broad discretion to either direct the jury to resume its deliberations or to declare a mistrial. *See Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *United States v. Rodriguez,* 497 F.2d 172 (5th Cir.1974).

■ If the district court grants a mistrial in this circumstance, there is no impediment to a retrial of the defendants on the mistried counts unless the mistrial was granted without manifest necessity. As the Supreme Court in *Arizona v. Washington* held,

> [W]ithout exception the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws.
>
> Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury.

434 U.S. 497, 508, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978); *see also Grandberry v. Bonner,* 653 F.2d 1010 (5th Cir.1981).

The record in this case strongly suggests that the jury would have never reached a unanimous verdict. Two jurors took the difficult step of changing their vote from guilty to not guilty in open court. Statements in open court from two other jurors who remained in favor of a guilty verdict indicated the depth of the dissention among the jurors.

In *United States v. Love,* 597 F.2d 81 (6th Cir.1979), a juror changed his vote when he was polled, and the trial court granted a mistrial. The court of appeals found no impediment to retrying the defendant on the mistried charges. The court stated,

> Under all of the circumstances, where a juror had voted one way in the jury room and expressed a contrary belief with respect to guilt in open court, it is unlikely that a unanimous verdict would have been reached upon further deliberation.

*Id.* at 86.

■ Thus if the district court had immediately declared a mistrial when the jury was polled, the government would clearly be entitled to retry appellants on the importation counts. We see no good reason why we should reach a different result because the trial court delayed in reaching its decision. Appellants point to no prejudice they suffered as a result of the delay. The district court should not be criticized for taking a reasonable amount of time away from the heat of the trial to consider what action it should take when unexpected events occurred as they did at the close of this trial. We conclude that the district court had every reason to believe that this jury could not agree on a verdict and discharged the jury because it was manifestly necessary to do so. The district court did not err in denying appellant's motion to dismiss the importation counts in the superceding indictment.

### IV.

Kinney and Deerman next contend that the government is collaterally estopped from maintaining that the telephone calls made on August 18 and 19, 1985, which are the subject of Counts 3 through 7 of the superceding indictment, were made by them to knowingly facilitate the importation of marijuana. Appellants insist that the jury, by acquitting them of possession and conspiracy to possess marijuana, found that appellants did not make the telephone calls to knowingly assist the smugglers. Appellants argue that if the jury had accepted the government's argument that appellants made telephone calls to actively assist the smugglers in arranging for a warehouse where the marijuana could be unloaded and warn Edwards and others of police surveillance, a rational jury would have found Deerman and Kinney guilty of all of the possession and importation counts. According to appellants, it follows that the jury could not have rationally acquitted them on the possession counts un-

less it rejected the government's contention that appellants made the telephone calls to knowingly assist the smugglers to import and possess the marijuana. Appellants argue that because the government is required to prove that they made the telephone calls, itemized in the superceding indictment, to *knowingly* facilitate the importation of marijuana, and because the jury necessarily resolved this crucial element of the government's case adversely to the government in the first trial, the government is precluded from trying appellants on those charges.

■ The Supreme Court in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), held that collateral estoppel is a part of the constitution's guarantee against double jeopardy. In this context, collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. at 1194. When applicable, collateral estoppel protects an accused in a criminal as well as a civil proceeding and extends to prevent redetermination of evidentiary facts as well as ultimate facts. *United States v. Lee*, 622 F.2d 787 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981); *United States v. Gonzalez*, 548 F.2d 1185 (5th Cir.1977).

Collateral estoppel may affect a later criminal prosecution in two ways: "(1) it may completely bar a subsequent prosecution; or (2) although the subsequent prosecution may proceed, it may operate to bar the introduction or argumentation of certain facts necessarily established in a prior proceeding." *United States v. Caucci*, 635 F.2d 441, 448 (5th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981). We are only concerned in this case with whether the prosecution is barred.[1]

■ Collateral estoppel bars relitigation only of those facts necessarily determined

in the first trial. "When a fact is not *necessarily* determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue." *Lee*, 622 F.2d at 790 (emphasis in original); *see also United States v. Levy*, 803 F.2d 1390, 1398 (5th Cir.1986). Appellants' collateral estoppel claim therefore depends upon what facts the jury necessarily decided in the first trial. In making this evaluation, we must examine allegations of the indictment, testimony, court's instructions to the jury, and jury's verdict to consider what makes the jury's verdict coherent. *See Levy*, 803 F.2d 1390; *United States v. Henry*, 661 F.2d 894 (5th Cir.1981), *cert. denied*, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982); *United States v. Larkin*, 605 F.2d 1360, 1369 (5th Cir.1979), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 793 (1980). We should make this determination in a realistic, rational, and practical way, keeping in mind all the circumstances. *Lee*, 622 F.2d at 790.

■ Our review of the record and the jury verdict leads us to agree with the appellants' premise that the jury necessarily rejected the government's argument that appellants made the telephone calls in question to knowingly facilitate the defendants' *possession* of marijuana. Appellants' argument however requires that we answer an additional question: Does it necessarily follow that the jury also rejected the government's argument that appellants made the telephone calls to knowingly facilitate the *importation* of marijuana?

A reasonable jury was entitled to find from the evidence that (1) the expertise of Kinney and Deerman as supervisors in the marine branch of the Customs Service and the laws they were charged with enforcing were primarily related to the illegal importation of contraband; and (2) Kinney's and Deerman's special knowledge of the safest locations on the Louisiana waterways to land a large shipment of marijuana in

---

1. We decline to determine whether any of the government's evidence used in the earlier trial

must be excluded on retrial. *United States v. Lee*, 622 F.2d 787, 791 (5th Cir.1980).

the New Orleans area was the main reason Fink and Edwards decided to land the marijuana within the geographic area Deerman and Kinney served. The jury was entitled to conclude from the above facts that the appellants' value to the criminal enterprise was primarily in the importation phase of the operations.

The jury was also entitled to find that most of the appellants' efforts were directed toward the importation phase of the operations rather than the possession or distribution phases. These efforts included the following: use of the law enforcement computer (TEC) to determine which of the defendants' vessels were on the "hot" list as suspected carriers of drugs; recommending a warehouse where the marijuana could be offloaded safely without detection; transmitting confidential law enforcement information to the smugglers that would assist the smugglers in landing the marijuana without detection; and directing Customs agents to patrol in areas that would be well away from the area where the marijuana was to be landed.

In viewing the record and the jury's verdict in a practical way, we also must consider that though the jury did not convict appellants on the importation counts they also did not acquit the appellants on these counts. If the jury did reject the government's argument that the defendants made the phone calls to knowingly facilitate the importation of marijuana, then a rational jury would have acquitted appellants on the importation counts.

In sum, because the bulk of the government's case against appellants related to their efforts to assist in the importation of the marijuana, we are persuaded that a rational jury could have found that the government established that the telephone calls were made to assist in the importation of marijuana and not its possession. The refusal of the jury to acquit on the importation counts is consistent with this explanation of the verdict. Therefore we cannot say that the jury necessarily determined that appellants did not make the telephone calls to assist in the importation of the marijuana.

AFFIRMED.