John Anthony McKinney was indicted for the offense of robbery in the first degree, in violation of § 13A-8-41, Code of Alabama 1975. The jury found the appellant guilty as charged in the indictment, and the trial judge sentenced the appellant to life imprisonment as a habitual felony offender.
 I
This is an appeal from the appellant's second trial for this offense. The following occurred at the appellant's first trial:
 "(Jury returned to the courtroom after deliberating during which the following occurred:)
"THE COURT: Mr. Perez, are you the foreman?
 "FOREPERSON: Your Honor, I'm the designated foreman of the jury. We have come across a problem that we need some advice upon.
"THE COURT: All right.
 "FOREPERSON: We have taken a preliminary vote which is not unanimous and we are going back for further discussion. There is one member of our jury who feels at this point that he or she cannot vote one way or another because he was not a witness to the crime. We would like you to instruct the jury in whole without pointing out this particular person why it is his responsibility to make a decision of guilty or not guilty based on the testimony here; that he did not have to witness the crime to make a decision." (S.R. 2.)
The trial judge then told the jury that if a person witnessed a crime, that person could not serve as a juror in the trial of that case. He stated that their duty as jurors was to decide the case based on the evidence presented at trial. The colloquy between the trial judge and the foreperson of the jury then continued:
 "FOREPERSON: Your Honor, excuse me. One last question. I'm hoping that that explained to this particular person exactly what his duty is. *Page 872 
 "THE COURT: Don't y'all get aggravated at anybody because this is brand new. It's a new experience.
 "FOREPERSON: I understand that. I need to ask a question that you can clarify for us. If we go back and this person still refuses to vote guilty or not guilty and we come out, we cannot give a decision, can we?
"THE COURT: The verdict has to be unanimous.
 "FOREPERSON: So you're going to ask each one of us if we vote guilty or not guilty?
"THE COURT: Yes.
 "FOREPERSON: And a person cannot say, I refuse to vote?
 "THE COURT: Well, a refusal to vote on that ground, refusing to vote simply because the person didn't see the crime would be failing to fulfill the oath of office. I'm not planning to put anybody in jail.
 "FOREPERSON: No. But what I mean is that we would not be fulfilling our duty? As a jury we would not reach a decision.
 "THE COURT: Well, that's correct. It would be a waste of two days. And it means that we would start all over again and pick twelve more people. Probably not as wonderful a group of twelve people as we've got here cause as I've said, this is a remarkable, wonderful cross section of the community here. The next time we pick a jury I don't know if it would be quite as wonderful a jury. But we would pick somebody and somebody would sit through exactly the same procedure and eventually we would get a verdict. If the case has to be tried many times, it has to be tried many times. I trust — I'm sure every juror wants to fulfill his oath of office. Now that I've defined it perhaps the jury will succeed.
 "FOREPERSON: May I ask you in layman's terms, by oath of office you mean a promise to work on the jury and come to a decision?
 "THE COURT: Well, sure. When all of you got in the jury box, when the thirteen jurors got in the jury box I asked you all to stand and raise your right hands and I administered an oath of office to you. That oath was as sacred an oath as I took. When I was sworn in as a judge I took an oath of office that I would rule with the law. If a case came before me and I just said, well, I just don't feel like making any decision in this case, that would be a violation of my oath of office. I could be censored by the judicial inquiry commission. It would be that serious of a thing. I have to fulfill my oath of office or else I've just violated my oath.
 "FOREPERSON: I understand, Your Honor. I simply was bringing it down to the word promise because I think this person would understand that better than oath.
 "THE COURT: Well, it's a sacred kind of promise. It's a promise that you make to God and your fellow citizens. It's more than just a promise to pick up the bread at the grocery store.
 "FOREPERSON: Right. I was trying to get it in layman's terms. Thank you, Your Honor." (S.R. 4-7.)
The trial judge then told the jury that while a verdict had to be unanimous, he was not suggesting that everyone had to agree with the majority and he wanted each juror to vote his conscience. The jury then continued their deliberations. The following occurred after these deliberations:
 "THE COURT: All right. Mr. Perez, how are y'all doing?
 "FOREPERSON: We're doing a little better, Your Honor. We have eleven members in agreement. We still have one juror —
 "THE COURT: Don't tell me which way it's going. Don't tell me that.
 "FOREPERSON: We have a juror who is confused. She still believes that she had to have been a witness to the crime to cast a decision one way or the other. It's not a reasonable doubt situation. It's just that she believes she cannot make a decision because she did not witness the crime. And your last instruction did not explain it fully to her. And perhaps if you want to do it again in *Page 873 
layman's terms, she might understand." (S.R. 13-14.)
The trial judge again told the jury that a juror could not be a witness to the crime. He then thoroughly instructed them on the duties and responsibilities of a juror. The trial judge then sent the jury out for further deliberations. After a period of time, the following took place:
 "THE COURT: All right. Mr. Perez, has the jury reached its verdict?
"FOREPERSON: Yes, Your Honor, we have.
"THE COURT: Would you read it to us, please, sir?
 "FOREPERSON: We, the jury, find the defendant, John Anthony McKinney, not guilty.
 "THE COURT: Mr. Myers, would you bring me the verdict form. Now, first of all, I'll ask Mr. Perez, is this your signature on this verdict?
"FOREPERSON: Yes, Your Honor.
 "THE COURT: Now, I'm going to do as I said I would do and poll the jury. Mr. Perez, is this your verdict?
"FOREPERSON: Yes, Your Honor, it is.
"THE COURT: Ms. Smith, is this your verdict?
"MS. SMITH: I don't understand.
 "THE COURT: I see. Well, I need to know whether or not you agree that the defendant is not guilty and whether you have voted that the defendant is not guilty.
"MS. SMITH: I don't know.
 "THE COURT: You do not know. I see. Did you cast a vote on the final vote? Ms. Smith, can you hear me? And I'm not trying to badger you. I don't want to make you feel bad. I just need to know whether this is your verdict and whether you agreed to it or did not agree to it. Can you tell me that? Can you tell me whether you did agree or did not agree to this verdict?
 "MS. SMITH: I don't know cause I didn't see it. And I don't know.
 "MS. MURPHREE: Your Honor, we would respectfully move for a mistrial at this time.
 "MR. SHARBROUGH: We would object to that, Your Honor.
 "THE COURT: Well, we don't have a verdict at this point. It may be that — I will have to inquire into Ms. Smith, into whether or not she can perform as a juror. Ms. Smith, let me ask you whether you understand that you are not required to see the event in order to serve as a juror? So you understand that? "FOREPERSON: Your Honor, I think Ms. Smith is hard of hearing also.
 "THE COURT: I see. You know, that may have been the problem. That would create real problems. I'm afraid we don't have a verdict.
 "MR. SHARBROUGH: Your Honor, the defense would request that the jury be allowed more time.
 "MS. MURPHREE: Your Honor, again, based upon the response and lack of response of that juror we would again move for a mistrial.
 "THE COURT: Ms. Smith, let me ask you this. Were you able to hear the evidence as it was being presented to you during the trial? Let the record show that I have spoken to Ms. Smith in a louder than usual tone of voice or at least in a very audible tone of voice, somewhat louder than conversational, and Ms. Smith has not responded. I have the feeling Ms. Smith is not hearing what I'm saying at all. Either not hearing it or not comprehending it. And because I can't get a response from Ms. Smith on whether or not she has heard the evidence, I'm concerned whether she can serve as a juror. This is an unfortunately late time in the proceedings to be finding out. But Ms. Smith, I'll ask you again whether you were able to hear the evidence as it was presented? Were you able to hear it? Let the record show that after a long, long pause, I did not get any response from Ms. Smith. Ladies and gentlemen, this is a real misfortune. None of us had any way of knowing that this situation existed and all you ladies and gentlemen or the eleven of you certainly who have been able to hear the trial have worked awfully hard on it. *Page 874 
Both sides have worked awfully hard. But we don't seem to have a verdict. It takes a unanimous verdict from a competent jury either to acquit or to convict. We can neither convict or acquit without twelve affirmative votes. I mean twelve votes for one verdict or the other.
 "MR. SHARBROUGH: Your Honor, the defense would request that the jury be sent home and brought back in the morning before this case is declared a mistrial. "THE COURT: Well, if it were a cerebral problem, if it were a matter of figuring something out, that's one thing but where my conclusion is that one of the jurors simply has not absorbed anything — the Code of Alabama says that in order to serve a juror must be able to hear. That is, to be able to hear the evidence and must be able to be able to comprehend the evidence. And from Ms. Smith's utter lack of response I'm afraid that those qualifications have not been met and that that problem simply didn't come to the attention of the judge who empaneled the entire jury venire on Monday and divided them up into panels. Accordingly, the State's motion for a mistrial is granted." (S.R. 18-22.)
The appellant contends that his second trial, following the declaration of a mistrial at his first trial, placed him in double jeopardy.
 "When a mistrial is declared over defendant's objection, the question may arise whether under the Double Jeopardy Clause of the Fifth Amendment there can be a new trial. Jeopardy will attach when the first jury in the case is empaneled and sworn. Crist v. Bretz, 437 U.S. 28, 29, 98 S.Ct. 2156, 2157, 57 L.Ed.2d 24 (1978); (citation omitted). The constitutional prohibition of twice placing the defendant in jeopardy embraces the defendant's 'valued right to have his trial completed by a particular tribunal.' Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); (citation omitted). Yet, this right will be subordinated in particular circumstances 'to the public interest in affording the prosecutor one full and fair opportunity to present [the] evidence to an impartial jury.' Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978). In short, the [court] may declare a mistrial and retry a defendant without violating the Double Jeopardy Clause if there was a 'manifest necessity' for the discharge of the original proceeding or if the 'ends of public justice' would be otherwise defeated if a mistrial was not declared. (Citation omitted.)"
United States v. Salvador, 740 F.2d 752, 754 (9th Cir. 1984),cert. denied, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980
(1985).
"The 'prototypical example' of a case meeting the 'manifest necessity' standard . . . is the hung jury." Ex Parte Anderson,457 So.2d 446, 448 (Ala. 1984). "[T]he mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict . . . [is] the classic basis for a proper mistrial."Arizona v. Washington, 434 U.S. 497, 509, 98 S.Ct. 824, 832,54 L.Ed.2d 717 (1978). A mistrial, declared after a trial judge has determined that the jury cannot agree upon a verdict, does not terminate the original jeopardy to which the defendant was subjected. Richardson v. United States, 468 U.S. 317,104 S.Ct. 3081, 82 L.Ed.2d 242 (1984). Thus, a defendant's retrial following a hung jury does not constitute double jeopardy under the Alabama or United States Constitutions.
The appellant argues that there was no "manifest necessity" for declaring a mistrial in this case. See § 12-16-233, Code of Alabama 1975. He contends that the trial judge should have encouraged the jury to deliberate longer before he declared a mistrial. Section 12-16-15, Code of Alabama 1975 provides that:
 "When a verdict is entered in either a civil or criminal case and before it is recorded, the jury may be polled, on the requirement of either party, in which case they must be asked severally if it is their verdict; and, if any answer in the negative, the jury must be sent out for further deliberation."
Here, the trial judge polled the jury on his own initiative after the foreperson announced the verdict. When he learned that *Page 875 
the verdict was not unanimous, the trial judge could have, as defense counsel argues, urged the jury to deliberate further. However, under the circumstances of this case, it is clear that the trial judge did not abuse his discretion in declaring a mistrial due to "manifest necessity." Although the judge did not technically comply with § 12-16-15, since he failed to send the jury back out when he learned that they were deadlocked after he had polled them, the trial judge certainly complied with the "spirit" of the statute. At the point at which the trial judge declared the mistrial, he had done as much as was humanly possible to encourage the jury to reach a verdict. As can be seen from the relevant portions of the transcript of the first trial as quoted above, the trial judge was apprised early on that the jury was having difficulty reaching a verdict. On at least two occasions, the trial judge thoroughly and carefully instructed the jury concerning the oaths they took and their duties as jurors. The judge encouraged the jury to reach a unanimous verdict, but, at the same time, he told them that they had to abide by their convictions even if they disagreed with the majority of the other jurors. At the point when the judge ascertained that Ms. Smith was the holdout juror, he thoroughly questioned her to determine whether it would be possible to obtain a verdict. His examination of Ms. Smith led the judge to conclude that this particular jury could not reach a verdict, and thus, he declared a mistrial due to "manifest necessity."
In United States v. Love, 597 F.2d 81 (6th Cir. 1979), the court was faced with a situation similar to the one at bar. InLove, the jury, after three hours of deliberation, were unable to agree on a verdict. The trial judge then urged the jury to deliberate further, which they did. After a while, the jury returned, and the foreman announced that they had reached a verdict of not guilty. The trial judge then polled the jury and determined that one of the jurors did not agree with the announced verdict. A mistrial due to "manifest necessity" was then declared by the trial judge. In determining that the defendant's retrial did not constitute double jeopardy, the Sixth Circuit stated that "[t]hough the defendant suffered the anguish of seeing his apparent acquittal vanish as a result of the jury poll, we believe 'the public's interest in fair trials designed to end in just judgments,' Wade v. Hunter, 336 U.S. at 68889, 69 S.Ct. at 837, justified the declaration of a mistrial." Love, 597 F.2d at 86. See also United States v.Deerman, 837 F.2d 684 (5th Cir. 1988) (mistrial necessary when two jurors changed their votes to "not guilty" after the foreman had announced a "guilty" verdict); Salvador (mistrial necessary since "[a]greement by the jury as to a verdict was not possible because 'religious inspiration' prevented one juror from considering the evidence at all"); Lindsey v. State,456 So.2d 383 (Ala.Crim.App. 1983), aff'd, 456 So.2d 393
(Ala. 1984) (mistrial properly declared after jury, which was split eleven to one, twice informed the trial judge that they were deadlocked).
In Ex Parte Anderson, 457 So.2d 435 (Ala.Crim.App.), aff'd,457 So.2d 446 (Ala. 1984), this court, quoting Arizona v.Washington, 434 U.S. at 509-10, 98 S.Ct. at 832, stated:
 "[T]here are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his 'valued right to have his trial completed by a particular tribunal.' But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the 'necessity' for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. *Page 876 
Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court."
We find that the trial judge did not abuse his discretion by declaring a mistrial under the facts of this case. Further deliberations by this particular jury would have been futile and potentially coercive towards Ms. Smith in light of the trial judge's examination of her. Lindsey v. Smith,820 F.2d 1137 (11th Cir. 1987), cert. denied, 489 U.S. 1059,109 S.Ct. 1327, 103 L.Ed.2d 595 (1989). Therefore, the appellant's second trial did not violate the federal or state prohibitions against double jeopardy.
 II
Prior to the appellant's first trial, a discovery order was entered in this case. One of the provisions of the order reads as follows:
 "1. The District Attorney shall produce or make available to the Defendant's attorney at arraignment the following:
". . . .
 "(b) All statements of the Defendant which are reduced to writing;
 "(c) All statements of the Defendant which are electronically recorded or taped, and any transcripts thereof;
 "(d) The substance of any oral statements made by the Defendant which are not included within (b) and (c) hereof or if the District Attorney knows of any statements or spontaneous remarks made while the Defendant is in custody of the police or during the investigation." (R. 11-12.)
In a hearing outside the presence of the jury during the course of the appellant's second trial, the appellant's former girlfriend, Annie Jackson, testified that the appellant called her on the day of the robbery and asked her if the police had been to her house and asked her what she had told them. On another occasion, Jackson saw the appellant, and the appellant asked her what she was going to say at trial. Jackson testified that she told one of the police officers about the second conversation with the appellant. She also stated that she testified at the first trial that she had had these two conversations with the appellant but that she did not testify as to the substance of these conversations because she was not asked.
Defense counsel objected and stated that Jackson should not be allowed to testify about the statements that the appellant had made to her during the two conversations. Defense counsel argued that, under the discovery order quoted above, he was entitled to be informed of the substance of the statements made by the appellant to Jackson prior to trial.
The trial judge stated that there had not been a discovery order entered in this case because it was not included on the case action summary, and he then allowed Jackson to testify about her conversations with the appellant. However, the above-quoted discovery order shall be considered by this court, since it was signed and dated by a circuit judge of Mobile County and it is included in the record. Furthermore, the state filed a response to this discovery order.
Clearly, under the present discovery rules, the state was not required to disclose to the appellant the substance of his statements to Jackson. See Rule 18.1(a), A.R.Crim.P. (Temp.).Compare Ex Parte Lambert, 519 So.2d 899 (Ala. 1987). However, under the broadly worded language of subsection (d) of the discovery order, it does appear that the appellant would have been entitled to learn the substance of his statements which were made to Jackson.
Nevertheless, any error which occurred due to the failure of the state to disclose this information to the appellant was harmless. In making his objection to the trial court, defense counsel stated, "Had I known that's what she was going to testify to . . . I would have most certainly tried to interview her if she would have talked to me about the statement had I known such a statement existed." Since Jackson testified at the first trial that she had had conversations with the appellant, defense *Page 877 
counsel should have been put on notice that conversations between Jackson and the appellant had occurred and that statements were most likely made by the appellant during the course of those conversations. Defense counsel could have requested the state to disclose the substance of the appellant's statements to Jackson prior to the start of the second trial, or defense counsel could have interviewed Jackson since he knew a conversation had taken place between Jackson and the appellant. Furthermore, there was overwhelming evidence of the appellant's guilt presented at trial. Three witnesses identified the appellant as the robber in this case. Thus, we find that the state's failure to disclose this evidence did not result in substantial prejudice to the appellant. Rule 45, A.R.App.P.; Montgomery v. State, 504 So.2d 370
(Ala.Crim.App. 1987); Watkins v. State, 509 So.2d 1067
(Ala.Crim.App. 1985).
The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.