UNITED STATES of America,
Plaintiff-Appellee,

v.

Elias Que SALVADOR,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Katrina Denise SALVADOR,
Defendant-Appellant.

Nos. 81–1759, 81–1797.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 3, 1982.

Decided Aug. 15, 1984.

Arthur G. Garcia, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Francisco Leon, Asst. Federal Public Defender, Michael Morales, Phoenix, Ariz., for defendant-appellant.

Before CHAMBERS and GOODWIN, Circuit Judges, and EAST,* District Judge.

EAST, Senior District Judge:

The appellants Elias Que Salvador and Katrina Denise Salvador (husband and wife) were tried in federal court for the armed robbery of a credit union (18 U.S.C. §§ 2, 2113). Appellants' first trial was terminated by a declaration of mistrial when the jury found itself deadlocked. Upon retrial, Elias Salvador was convicted on both counts of the indictment for the robbery of a federally insured credit union in violation of 18 U.S.C. §§ 2, 2113(a) (Count I), and for doing so with the use of a dangerous weapon in violation of 18 U.S.C. §§ 2, 2113(d) (Count II). Katrina Salvador was convicted on Count I of the indictment for her participation in the robbery and acquitted as to Count II.

On appeal from the judgment of conviction and sentence to custody, the Salvadors seek reversal based on two assertions of error. Initially, appellants contend the District Court abused its discretion in declaring a mistrial, and that as a result their reprosecution for the robbery was barred

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

by the Double Jeopardy Clause of the Fifth Amendment. Appellants further contend the District Court erroneously denied their pretrial motion to suppress the evidence obtained as a result of the warrantless entry into a residence by the arresting authorities. We note jurisdiction and affirm.

We first address the double jeopardy claim because, if meritorious, it would bar further prosecution notwithstanding the propriety of the District Court's exclusion ruling.

## I.

### DOUBLE JEOPARDY

Appellants' first trial began on October 15, 1981, and six days later was terminated by a declaration of mistrial when the jury failed to reach a verdict. The presentation of testimony and argument to the jury had taken only three and a half days. Yet, after deliberating approximately nine hours, the jury sent a note to the District Judge on the second day of deliberations stating: "The jury is not able to reach a decision on either defendant. We are deadlocked." After discussions with counsel, the District Judge gave the modified *Allen* charge and sent the jury back to deliberate.[1] After deliberating an additional four hours and recessing overnight, the jury foreman sent a second and more explicit note about the deadlock to the court the next morning. This second note stated:

> We are unable to reach a decision. The problem is a reliance on an answer arrived at through religious inspiration, and an unwillingness to move from that decision and base a decision on the evidence.
>
> The evidence has been thoroughly examined. Those basing their decision on the evidence are unwilling to change.

After receipt of this second note, the District Judge discharged the jury and, over appellants' objection, declared a mistrial.

When a second trial date was set, appellants joined in a motion to dismiss the indictment on grounds of double jeopardy. The District Court denied the motion. A second trial began the following month, on November 17, 1981. Two days after this second trial had begun, the jury returned the guilty verdicts which are the subject of this appeal. We find no abuse of the District Court's discretion in declaring a mistrial after the initial jury had twice reported that they were deadlocked in the matter.

When a mistrial is declared over defendant's objection, the question may arise whether under the Double Jeopardy Clause of the Fifth Amendment there can be a new trial. Jeopardy will attach when the first jury in the case is empaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 29, 98 S.Ct. 2156, 2157, 57 L.Ed.2d 24 (1978); *United States v. Williams*, 717 F.2d 473, 475 (9th Cir.1983). The constitutional prohibition of twice placing the defendant in jeopardy embraces the defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *United States v. See*, 505 F.2d 845, 851 (9th Cir.1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975). Yet, this right will be subordinated in particular circumstances "to the public interest in affording the prosecutor one full and fair opportunity to present [the] evidence to an impartial jury." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978). In short, the District Court may declare a mistrial and retry a defendant without violating the Double Jeopardy Clause if there was a "manifest necessity" for the discharge of the original proceedings or if the "ends of public justice" would be otherwise defeated if a mistrial was not declared. *United States v. Cawley*, 630 F.2d 1345, 1348 (9th Cir.1980).

---

1. Appellants do not assign error to the giving of the modified *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896); *United States v. Handy*, 454 F.2d 885, 889 (9th Cir.1971), *cert. denied*, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972) (*Allen* instruction approved in this circuit); *United States v. Sae-Chua*, 725 F.2d 530, 531 (9th Cir. 1984).

■ The trial court can order a mistrial and proceed to a new trial where the jury is unable to agree. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). In fact, the "deadlocked" jury is the classic example of "manifest necessity." *Rogers v. United States*, 609 F.2d 1315, 1317 (9th Cir.1979); *Arnold v. McCarthy*, 566 F.2d 1377, 1386 (9th Cir. 1978). Moreover, the jury's own statement that it is unable to reach a verdict is the most critical factor. *United States v. Cawley*, 630 F.2d at 1349; *United States v. See*, 505 F.2d at 851. Finally, the trial judge's decision to declare a mistrial because of jury deadlock "is accorded great deference by a reviewing court, because the trial judge is in the best position to assess the relevant facts." *United States v. Cawley*, 630 F.2d at 1348. *Arizona v. Washington*, 434 U.S. at 509–10, 98 S.Ct. at 832; *United States v. Armstrong*, 654 F.2d 1328, 1333 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 and 455 U.S. 926 (1982).

■ Although the jury is obligated to decide the case solely on the evidence, it became apparent to the court upon receipt of the second jury note that one of its members steadfastly declined to attend to that duty. Agreement by the jury as to a verdict was not possible because "religious inspiration" prevented one juror from considering the evidence at all. To question the jurors individually on the possibility that the peculiar deadlock could be overcome by further deliberation would have been futile in this case and potentially coercive, thus denying both the government and appellants a fair and impartial jury. The *Allen* charge had been read to the jury the day before the second note was received. The court was simply presented here with no other reasonable alternative but to declare a mistrial. Where a juror has admittedly decided not to consider the evidence, and approximately fourteen hours of deliberation in a three and a half day trial of relative simplicity has not proved to be otherwise persuasive, the requisite "manifest necessity" exists to declare a mistrial.

We are mindful that the court must not ignore the defendant's interest in having the trial concluded in a single proceeding. But the court must in turn be careful not to attempt to extract a verdict from the jury by unacceptably coercive means. We are satisfied that the District Court exercised sound discretion in declaring a mistrial in this matter. Appellants' retrial did not violate the Double Jeopardy Clause.

## II.

### WARRANTLESS SEARCH

In pretrial motions, the appellants sought to suppress evidence seized during the warrantless search of their relatives' residence following their arrest in the home. The District Court denied the motions.

■ Appellants contend the agent's warrantless forcible entry into the house where they were visiting[2] violated the Fourth Amendment. Appellants further argue that the subsequent consent search which led to the seizure of several items pertaining to the robbery was tainted by that illegality. The facts presented by the government during the proceedings as justification for the search are as follows.

---

**2.** The District Court doubted the adequacy of appellants' privacy interest in their relatives' house, but proceeded to examine the other Fourth Amendment issues in the case. We also reach these issues, but do so believing that appellants had a reasonable expectation of privacy in the area searched. *See United States v. Robertson*, 606 F.2d 853, 858 n. 2 (9th Cir.1979). *Compare with United States v. Meyer*, 656 F.2d 979, 981 (5th Cir.1981), *cert. denied*, 104 S.Ct. 507, 1413 (1982). Appellants had stayed at their relatives' house overnight and for longer periods on prior occasions. They also kept personal belongings at the residence. Appellants gave at least one person the relatives' telephone number as a place to be contacted. Appellants' child was babysat by a neighbor at the house. Appellants are entitled to challenge the seizure of the items from the relatives' residence. *United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978).

In the early afternoon on June 15, 1981, the Desert Schools Federal Credit Union in Phoenix was robbed at gun point by a black male wearing a green jogging suit and a stocking mask through which a thin mustache could be seen. While the robbery was taking place inside of the credit union, a light colored Cadillac sat outside facing the wrong way in the entrance to the parking lot with its motor running. A witness in the parking lot happened to observe the Cadillac and noted the license plate number. The witness additionally noted that the black woman driver of the Cadillac wore a distinctive diamond ring and had a small child with her in the car. In the ensuing moments, the bandit was seen fleeing from the credit union office in the direction of the waiting Cadillac.

Minutes after the robbery a special agent of the FBI, Stephen Chenoweth, began investigating the incident. The Cadillac and license number reported by the witness were familiar to Agent Chenoweth. At the time the vehicle was thought to be associated with a known bank robber named Robertson, considered to be the leader of a group of men involved in several San Diego area armed bank robberies, and possibly a robbery of the very same Phoenix credit union a month earlier. Initially, his investigation led Agent Chenoweth to Robertson's house where the car was previously seen parked, but Robertson had moved.

The investigation next led to the Tempe residence of the registered owner of the Cadillac. Agent Chenoweth was told by the registered owner's husband in an interview conducted that afternoon that he had sold the Cadillac to a black man nicknamed "Que" whom he had met in San Diego through Robertson, the known bank robber. The description the husband gave of "Que" fit that of the bandit, including that he had seen "Que" wearing a green athletic suit three days earlier. The husband also gave the agent "Que's" telephone number, which he got over the telephone from Robertson in San Diego while the agent was present. The number was traced to one Salvador Laquentha at a residence address in Phoenix.

When Agent Chenoweth arrived at the Phoenix residence shortly after seven the evening of the robbery, the suspect Cadillac was parked in the carport. A watch of the house was set up and conversation with neighbors revealed to the agents that a black couple with a small child lived in the house. After thirty to forty-five minutes of observation, Agent Chenoweth went to the front door of the residence accompanied by another agent and a uniformed police officer. Agent Chenoweth wanted to find out if there was anyone in the residence and, if so, whether they fit the description given of the robbery suspects or could provide any information about the robbery. Interested neighbors had begun gathering in the area, and a small crowd, including children, had formed near the residence.

Without drawing his weapon, the agent knocked on the front door and announced that he was from the FBI. Agent Chenoweth believed he then heard a female voice ask who was there, whereupon the agent announced that he wanted to talk to the occupants. When no further response was heard, the agent again knocked on the door and announced that he was from the FBI. Just right of his position at the front door, Agent Chenoweth then saw the window curtains rapidly close and heard some commotion from within the residence. In the next moments, Agent Chenoweth forced open the front door, believing the occupants were getting ready to "do battle." Agent Chenoweth drew his weapon and took a defensive position crouched in the front door jam. The agent again identified himself and told the occupants to come out into the living room in the front of the house. Eventually they emerged: a black male fitting the description of the bandit, a black woman wearing the described diamond ring, and a small child.

The authorities immediately conducted a protective walk-through of the residence and arrested the appellants. Appellants told the officers that they did not own the

house, but were guests of their relatives who leased the residence.

While the authorities were securing the premises for the evening until a search warrant could be obtained the next morning, the relatives, Harvey and Laquentha Salvador, returned to their house. The agent explained to the Salvadors that the officers would continue to secure the house that evening, in which case they would be put up in a motel for the night or they could consent to a search that evening. After he was advised of the right not to consent to the search, Harvey Salvador signed a consent form. The house was then searched.

In the bedroom where the curtains were quickly closed, Harvey Salvador identified a brown purse not belonging to his wife and handed it to an agent, noting that it had a gun inside. The gun was later found to be fully loaded. Harvey Salvador also lifted a mattress and revealed $3,600 in cash, including one of the "bait bills" stolen from the credit union. The agents also found a nylon stocking knotted at one end and made into a mask. Earlier, during the protective walk-through, an agent had observed a canvas bag with a green jogging suit on top and a certificate of title for the Cadillac in a mail rack. Those items were also seized.

We are satisfied that Harvey Salvador consented to the search of his residence freely and voluntarily.[3] He was presented with the option of either an immediate consent search or one conducted pursuant to a warrant if it could be obtained in the morning. Harvey Salvador and his wife, Laquentha, were not in custody and were not subjected to oppressive conditions. *See, e.g., United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir.1980). *Compare with United States v. Agosto*, 502 F.2d 612 (9th Cir.1974). And as lessee and resident of the house, Harvey Salvador clearly had authority to consent to a search of its contents. *United States v. Rubio*, 727 F.2d 786, 796 (9th Cir.1983); *United States v. Dubrofsky*, 581 F.2d 208, 212 (9th Cir.1978).

Although a valid consent would normally provide an exception to the warrant requirement of the Fourth Amendment, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), our inquiry cannot end upon such a finding here because Harvey Salvador's consent was a product of the initial warrantless entry. If the initial entry was illegal, as appellants contend, because the circumstances were not sufficiently exigent to excuse the lack of a warrant, the subsequent consent of the lessee would probably not escape taint. Likewise, if the warrantless entry cannot pass constitutional muster, then the plain view discovery during the initial walk-through of the athletic suit and the Cadillac title certificate is also tainted. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *United States v. Taheri*, 648 F.2d 598, 600 (9th Cir.1981). Thus, the focus of our inquiry is squarely fixed on the initial warrantless entry by the arresting authorities. We conclude the entry was proper under the circumstances.

Probable cause requires "a reasonable belief, evaluated in light of the officer's experience and the practical considerations of everyday life, that the suspects have committed a crime and are to be found in the place to be searched." *United States v. Robertson*, 606 F.2d 853, 858 (9th Cir.1979). *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Given the information obtained by their investigative efforts in tracing the suspects throughout the day, the agents had "a strong reason to believe" the bandit was in the house where the getaway car was parked.[4] On the strength of this belief, an

---

**3.** We review the District Court's finding that the consent to search was voluntary under the clearly erroneous standard. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. McCon-*

*ney*, 728 F.2d 1195 (9th Cir.1984); *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1423 (9th Cir.1984).

**4.** We review de novo the ultimate finding of probable cause. *See Ker v. California*, 374 U.S.

arrest warrant, however, may have been difficult to obtain. The agents did not know the bandit's true identity, and their efforts to gain more background information based on the witness' detailed descriptions were unsuccessful. Neither had the authorities actually seen the occupants of the house during the thirty to forty-five minutes of observation that would confirm their suspicions. Although delay occurred while the authorities interviewed neighbors and sought further information about the bandit through their own law enforcement sources, it was not an unreasonable length of time. But because any additional delay could have led to unpredictable consequences if the robbery suspects remained armed or attempted to escape, the agents pursued a reasonable course of action in approaching the door to determine the occupants' identities.

■ The existence of probable cause alone will not support a warrantless entry into a dwelling. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir.1978) (anticipated *Payton*). An exception to the warrant requirement of the Fourth Amendment, however, is the presence of exigent circumstances.[5] We have defined exigent circumstances as "those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained."

*United States v. Robertson*, 606 F.2d at 859. We review the issue of exigency de novo, and conclude that the government has sustained its burden to show the warrantless entry was imperative. *United States v. McConney*, 728 F.2d 1195 (9th Cir.1984).

At the door, the agent knocked and identified himself.[6] As he stood outside knocking on the front door, the agent was aware of several important things. He knew that the bandit had been armed during the robbery that afternoon and that he probably was connected with an armed bank robbery group with a known propensity for violence. Moreover, because of the agents' interviews with neighbors and possible associates of the bandit during the day-long investigation, the occupants could have been tipped off about the investigation. Moreover, a number of curious neighbors had gathered in the area. No one answered the agent's repeated knocking at the front door of the house until a female voice was heard coming from inside. Then the window curtain next to the front door was quickly closed and noise was heard coming from inside. The agent forced entry at this time because he believed the occupants were getting ready to "do battle."

We find the agent's entry into the house reasonable to avoid probable violence that would involve not only the safety of the suspects and investigating authorities, but the neighbors observing nearby. Immediate action was imperative. A longer obser-

---

23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963); *United States v. McConney.*

**5.** Because the pursuit of appellants was not immediate or continuous from the scene of the crime, we cannot agree with the government that the warrantless entry was justified under the "hot pursuit" exigency exception to the Warrant Clause. *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *United States v. Scott,* 520 F.2d 697, 700 (9th Cir.1975), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976).

**6.** Appellants contend the agents failed to comply with the knock and announce provisions of 18 U.S.C. § 3109, which are applicable to warrantless entries, by not waiting for a refusal of admittance before forcing entry. *Sabbath v.*

*United States,* 391 U.S. 585, 588, 88 S.Ct. 1755, 1757, 20 L.Ed.2d 828 (1968); *United States v. Moreno,* 701 F.2d 815, (9th Cir.1983), *pet. for cert. filed,* 701 F.2d 815 (U.S.1983) (No. 83–396). Even if constructive "refusal of admittance" for purposes of the statute cannot be implied from the closing of the window curtain after the first or second knock and announcement, and the occupants nonresponse to at least one or two other attempts at communication by the agent, we are satisfied that exigent circumstances excused the agent's failure to wait any longer for a more explicit refusal before forcing entry. *United States v. Bustamante-Gamez,* 488 F.2d 4, 9–11 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). *See also United States v. Whitney,* 633 F.2d 902, 908 (9th Cir.1980), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981).

vation period which might have allowed for a certain identification of the suspects and the securing of a warrant would involve the attendant risks of delay, including discovery or escape. *United States v. McLaughlin,* 525 F.2d 517 (9th Cir.1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976). Moreover, although the gravity of the crime itself will not create exigency, it is an important factor to be considered when determining whether exigency exists. *Welsh v. Wisconsin,* —— U.S. ——, —— – ——, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (U.S.1984).

■ Accordingly, we find that the initial warrantless entry was supported by probable cause and exigent circumstances. The items found in plain view during the initial walk-through [7] and those other items seized after a voluntary consent was provided by the lessee of the premises were properly admitted as evidence against appellants. The District Court's denial of the appellants' suppression motion was proper.

The judgment of conviction and sentence of the District Court is affirmed.

AFFIRMED.

---

**7.** Once lawfully inside the house, it was proper for the authorities to conduct a protective walk-through of the house, and to seize the jogging suit and vehicle title document observed in plain view. *Payton v. New York,* 445 U.S. 573,

589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980); *Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *United States v. Gardner,* 627 F.2d 906, 909–10 (9th Cir.1980).