UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry Donnell GEORGE,
Defendant–Appellant.

No. 87–5256.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 1988.

Decided Aug. 22, 1989.

Fred L. Wright, Torrance, Cal., for defendant-appellant.

Gary S. Lincenberg, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before HALL, WIGGINS and THOMPSON, Circuit Judges.

WIGGINS, Circuit Judge:

Appellant Larry Donnell George appeals his convictions of three counts of armed bank robbery, in violation of 18 U.S.C. § 2113(c)(d) (1982), and three corresponding counts of using and carrying a firearm during the course of a crime of violence, in violation of 18 U.S.C. § 924(c) (1982). The jury found Appellant guilty based on physical evidence of his fingerprints at several of the banks and on a money bag found in his automobile; a large amount of cash, including bait bills, found in his automobile; a security guard's handgun found in his automobile; a .25 caliber handgun found in his apartment; $2,800 found in his apartment; and witnesses from each of the banks who identified Appellant from photospreads and in person as the perpetrator of the crimes.

Appellant offers three bases for reversing his convictions. First, Appellant claims that the district court erred when it denied his motion to suppress evidence seized from his apartment and automobile. Second, Appellant claims that the district court abused its discretion when is quashed a subpoena that Appellant had issued to the FBI. And third, Appellant claims that the district court abused its discretion when it deemed his case closed after he failed to present any further witnesses. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 (1982) and, because we find the evidence overwhelming and the district court's conduct proper, we affirm.

## I

Appellant's main contention on appeal is that the district court erred when it denied his motion to suppress evidence that had been seized from his apartment and automobile. The principal adverse witnesses at Appellant's suppression hearing were Officers Harry Kartinen and Robert Fowks of the Long Beach Police Department who each testified to the following sequence of events. On December 24, 1986, at approximately 1:00 p.m., Officer Kartinen participated in the investigation of an armed robbery that had just occurred at the Security Pacific National Bank in the City of Long Beach. While there he interviewed witnesses who described the assailant and explained to him that, before exiting, the assailant had told everyone to tell the police that the "Orange County Kid" had been there, and "Merry Christmas." About 1:30 p.m., while continuing the investigation, Officer Kartinen received a phone call from Federal Agent Kevin Adley, who Kartinen had known and worked with for nearly twenty years. Agent Adley explained that he had been investigating bank robberies in which Appellant was the leading suspect. After exchanging information Officer Kartinen and Agent Adley agreed that the robbery suspect matched Appellant's description and his modus operandi. Officer Kartinen then spoke with Officer Fowks, who had recently arrived at the bank, giving him a description of Appellant and the two vehicles that he was known to have been driving. Officer Fowks was then dispatched to Appellant's address to conduct surveillance.

Less than one hour later Officer Kartinen received a radio message that Agent Adley wanted to speak with him again. Officer Kartinen then contacted Agent Adley who explained that witnesses' descriptions of an assailant of a second bank robbery, which had just taken place at the Bank of America in Orange County, matched Appellant's description and, further, that the perpetrator had disarmed a uniformed security guard and shot him. Agent Adley also explained that Appellant was currently on probation for convictions of bank robberies that had taken place several years before and that Appellant's parole officer, after viewing surveillance photographs, identified him as the perpe-

trator of a bank robbery that had occurred earlier that month. Agent Adley noted as well that Appellant had a history of violent behavior during his bank robberies.

Officer Kartinen then joined forces with Officer Fowks to conduct surveillance of Appellant's apartment. Other officers also joined the stakeout, positioning themselves so that neither team viewed the same area. While waiting there Officer Kartinen once again received a radio message to contact Agent Adley. Officers Kartinen and Fowks then left the area to find a telephone. During his conversation with Agent Adley Officer Kartinen was told that witnesses at the Bank of America had positively identified Appellant as the robber. When Officers Kartinen and Fowks returned to Appellant's home at approximately 3:00 p.m., they noticed that his car had arrived out front, still warm from being recently driven, and that, although the screen door to his apartment remained closed, the front door was open. Officer Kartinen then directed the stakeout team to prepare to enter Appellant's apartment.

Without knocking or announcing their presence, Officers Kartinen and Fowks entered Appellant's apartment through the opened front door. When Officer Kartinen looked into the northwest bedroom he noticed a man, who he recognized as Appellant from photographs hanging on the wall, holding a black object in his hand. Officer Kartinen yelled "hold it," but when Appellant turned away Officer Kartinen fired his shotgun, hitting Appellant in the right arm and throwing him backward onto the bed. Fearing that Appellant was lying on a gun, Officer Kartinen asked Appellant several times where the gun was. Appellant finally pointed to the top drawer of a dresser next to the bed. Officers Kartinen and Fowks looked inside the drawer and noticed a .25 caliber pistol.

Appellant was then removed to a nearby hospital for treatment of the gunshot wound. Doctors working in the emergency room performed a brief neurological exam, determining that Appellant was oriented and aware of the situation, and that he was speaking and responding appropriately. Shortly after that, sometime around 4:00 p.m., Federal Agent James Leverick advised Appellant of his rights and then obtained Appellant's oral and written[1] consent to a search of his residence and automobile. Appellant's wife, who returned home sometime around 5:00 p.m., was met by Long Beach police officers and federal agents. They asked, and received, her consent to the search as well. According to Officers Fowks and Kartinen, the search of Appellant's apartment and automobile proceeded after that time.[2] Inside Appellant's automobile federal agents found the Bank of America security guard's handgun, five live .38 caliber rounds of ammunition, a box of .25 caliber bullets, and bait bills among $32,116, which was the exact amount of money stolen from the Bank of America. Inside Appellant's apartment Long Beach police officers found the .25 caliber handgun in Appellant's bedroom dresser and over $2,800 in currency.

The district court, after hearing this testimony, ruled against Appellant's motion to suppress evidence seized from his apartment and automobile. The district court reasoned that the initial warrantless and unannounced entry into Appellant's apartment to arrest him was justified by four exigencies, specifically, safety of the officers and public, hot pursuit of a suspect, prevention of the destruction of evidence, and prevention of escape. Moreover, the district court concluded that the subsequent warrantless search of Appellant's apartment was justified by both Appellant's and his wife's consent. Finally, the district court concluded that the warrantless search of the automobile was justified, in addition to Appellant's and his wife's

---

1. Because of his injuries, Appellant's written signature was made by placing an "x" on the consent form with his nonwriting, good arm.

2. Appellant's wife, who also testified at the suppression hearing, claimed that she did not sign the consent form until around 5:30 p.m. and by that time the search of the automobile had already been completed and the search of the apartment was in progress. The district court resolved this conflicting testimony against Appellant, stating: "On that point let me observe that I do not conclude any search was going on until Mrs. George executed her consent."

consent, by probable cause that it contained contraband.

## II

■ Appellant disputes the factual and legal basis of each of the district court's conclusions. Specifically, Appellant argues that neither he nor his wife effectively consented to the searches and, further, that the officers did not have probable cause to believe that his automobile contained contraband. We review the district court's findings of facts and determinations of credibility for clear error, but its ultimate legal conclusions of probable cause and exigent circumstances are reviewed de novo. *United States v. Klein,* 860 F.2d 1489, 1492 (9th Cir.1988) (legal conclusion of probable cause reviewed de novo); *United States v. McConney,* 728 F.2d 1195, 1204-05 (9th Cir.) (en banc) (legal conclusion of exigent circumstances reviewed de novo), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *see also United States v. Vasquez,* 858 F.2d 1387, 1389 (9th Cir.1988) ("voluntariness of consent is a question of fact," and therefore the district court's findings will not be upset absent "clear error"), *cert. denied,* — U.S. —, 109 S.Ct. 847, 102 L.Ed.2d 978 (1989).

### A

■ We consider first Appellant's argument that his own consent to the search of his apartment and automobile was ineffective. Appellant readily admits that his signature appears on a consent to search form. Overwhelming evidence also indicates that his signature was obtained only after he was advised of his rights and told that without his consent a warrant would be needed. Appellant argues nonetheless that his consent was involuntarily given, asserting that when he signed the consent form he believed he was signing a waiver of blood transfusion. We cannot conclude on the evidence before us, however, that the district court clearly erred when it rejected this assertion of fact. The joint testimony of a hospital employee and the treating physician confirms that, despite his serious injury, Appellant was able to understand his rights and freely respond to the Agent's request for his consent. We

are guided, then, by our previous decision in *United States v. Martin,* 781 F.2d 671 (9th Cir.1985), in which we found that a defendant's incriminatory statements were voluntarily given, despite his suffering from extreme pain and the effects of Demoral, because he was awake, relatively coherent, and spoke freely to the questioning officers. *See id.* at 673-74.

Appellant argues alternatively that even if his consent was voluntary it nevertheless was ineffective because it was not sufficiently attenuated from the taint of his illegal arrest. This argument requires us to consider, first whether Appellant's arrest was unlawful, and second, if it was unlawful, whether his consent was obtained "by exploitation of that illegality." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

### 1

In *United States v. Prescott,* 581 F.2d 1343 (9th Cir.1978), we anticipated the rule announced by the Supreme Court in *Payton v. New York,* 445 U.S. 573, 583-90, 100 S.Ct. 1371, 1378-82, 63 L.Ed.2d 639 (1980), that warrantless arrests in the home are prohibited by the fourth amendment to the United States Constitution absent a combination of probable cause and exigent circumstances. *See* 581 F.2d at 1350. Since then we, as well as the Supreme Court, have stressed that "searches and seizures inside a home without a warrant are presumptively unreasonable" and "that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin,* 466 U.S. 740, 749-50, 104 S.Ct. 2091, 2097-98, 80 L.Ed.2d 732 (1984) (quoting in part *Payton,* 445 U.S. at 586, 100 S.Ct. at 1380); *see, e.g., United States v. Alvarez,* 810 F.2d 879, 881 (9th Cir.1987). Thus the government in this case bears a twofold burden: "(1) it must show probable cause to secure the residence, and (2) it must show the existence of exigent circumstances to excuse the lack of a warrant." *United States v. Howard,* 828 F.2d 552, 555 (9th Cir.1987).

a

We consider first Appellant's claim that the government failed to meet its burden of showing that the police had sufficient probable cause to arrest him in his apartment. Probable cause requires "a reasonable belief, evaluated in light of the officer's experience and the practical considerations of everyday life, that the suspect[ ] . . . committed a crime and [is] to be found in the place to be searched." *United States v. Robertson,* 606 F.2d 853, 858 (9th Cir.1979). Undoubtedly the information provided by Agent Adley justified Officer Kartinen's reasonable belief that Appellant committed the bank robberies. Equally certain is that the officers reasonably believed that Appellant was inside his apartment; Appellant's car had appeared out front during their short absence and the front door of his apartment had been opened. Appellant contends, however, that the government failed to satisfy its evidentiary burden at the suppression hearing because only Officers Kartinen and Fowks testified and thus there was no proof "that the source of the information is something other than the imagination of an officer who does not become a witness." *People v. Madden,* 2 Cal.3d 1017, 1021, 471 P.2d 971, 973, 88 Cal.Rptr. 171, 173 (1970).

Appellant's argument presumes that California law controls our disposition of this question. That belief is clearly incorrect. *E.g., United States v. Chavez–Vernaza,* 844 F.2d 1368, 1374 (9th Cir.1987) ("evidence seized in compliance with federal law is admissible without regard to state law"); *United States v. Kovac,* 795 F.2d 1509, 1512 (9th Cir.1986) ("whether the officials complied with state law is not relevant; the only question is whether the officials acted in compliance with federal law"), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987). We are thus guided by the federal rule that the admissibility of evidence can be sustained on the basis of reliable hearsay statements of collaborating investigative officers. *See United States v. Merritt,* 695 F.2d 1263, 1268–70 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983); *cf. United States v. Castillo,* 866 F.2d 1071, 1077 (9th Cir.1988) ("magistrate may consider hearsay statements in an affidavit in determining whether there is probable cause to believe that a person is guilty of a crime"). We hold that the government met its burden of showing that Officers Kartinen and Fowks had sufficient probable cause to suspect Appellant of committing the crimes and of being inside his apartment.

b

We now turn our attention to Appellant's claim that exigent circumstances did not justify the warrantless entry into his apartment. Exigent circumstances are defined as "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). "The exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion." *United States v. Licata,* 761 F.2d 537, 543 (9th Cir.1985). But because "[e]xigent circumstances necessarily imply that there is insufficient time to get a warrant," *United States v. Echegoyen,* 799 F.2d 1271, 1279 n. 5 (9th Cir.1986), "the government must also show that a warrant could not have been obtained in time," *United States v. Good,* 780 F.2d 773, 775 (9th Cir.), *cert. denied,* 475 U.S. 1111, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986).

We begin by noting that the typical exigencies arise in a home arrest situation because the arresting officers reasonably believe that the suspects either know or will learn at any moment that they are in immediate danger of apprehension. *See, e.g., United States v. Manfredi,* 722 F.2d 519, 522 (9th Cir.1983) (officers reasonably believed that suspect would learn of his imminent capture at any moment when an arrested accomplice failed to return as expected); *United States v. Hackett,* 638

F.2d 1179, 1182 (9th Cir.1980) (when the suspects discovered a concealed police transmitter, "they realized that they were under surveillance and in imminent danger of arrest"), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); *United States v. Stubblefield,* 621 F.2d 980, 982 (9th Cir.1980) (officers were justified in entering home after arresting several suspects on their front porch; officers were reasonably concerned that additional suspects reportedly remaining inside of the home had become aware of their presence); *United States v. McLaughlin,* 525 F.2d 517, 521 (9th Cir.1975) (the arrest of an accomplice "made it likely that those in the McLaughlin residence would discover that they were under surveillance"), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976). These suspects—once faced with the distasteful prospect of severe punishment for committing serious offenses [3]—may in desperation discard or destroy incriminating evidence, search for avenues of escape, or resort to violence against the officers or, worse, against innocent bystanders. *See, e.g., United States v. Santana,* 427 U.S. 38, 43, 96 S.Ct. 2406, 2410, 49 L.Ed.2d 300 (1976) ("Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence."); *United States v. Salvador,* 740 F.2d 752, 758 (9th Cir.1984) (any delay after armed suspects became aware of police officers' presence not only would have jeopardized the "safety of the suspects and investigating authorities, but [also] the neighbors observing nearby"), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *United States v. Bustamante–Gamez,* 488 F.2d 4, 8–9 (9th Cir.1973) ("there was a substantial possibility that [the suspects] would try to escape or destroy the evidence" after it became apparent they "knew or [would] at any time learn of [the officers'] presence"), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). *See generally United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.) ("A suspect who realizes that he is in danger of immediate apprehension is clearly more likely to destroy evidence, to attempt an escape, or to engage in armed resistance than is a suspect who is taken unawares."), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978) (clearly erroneous standard of review for exigent circumstances later overruled by *United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). Law enforcement officers confronting such a situation obviously would be irresponsible if they stood idly by awaiting the command of a neutral magistrate.

Quite unlike that situation is one where the arresting officers have no reason to believe that the suspects are aware of their imminent capture. Suspects who are inside their homes and unaware of their impending arrests generally have no reason immediately to flee, *e.g., United States v. Blake,* 632 F.2d 731, 734 (9th Cir.1980) ("it is not clear that the officers had any substantial reason to believe that appellant would realize his apprehension was imminent and flee"), nor would they ordinarily have any reason immediately to destroy the fruits of their crime, *cf. United States v. Allard,* 600 F.2d 1301, 1304 (9th Cir.1979) (police had no reason to suspect that evidence would be destroyed because "[t]hey had no facts on which to base a reasonable belief that [one suspect] knew of [another's] arrest or had been instructed to destroy the cocaine"). Likewise, without more there is little reason for them to endanger the lives of themselves or others. Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises, *e.g., United States v. Calhoun,* 542 F.2d 1094, 1102 (9th Cir.1976) ("There were sufficient officers in the area that, instead of entry, they might have maintained surveillance while a warrant was sought."), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977), and either wait to effectuate a valid public arrest when the sus-

---

**3.** This point follows from the premise of *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), in which the Supreme Court held that the gravity of the underlying offense is an essential component of the exigency calcu-

lus. *Id.* at 753, 104 S.Ct. at 2099. One suspected of committing a minor offense would not likely resort to desperate measures to avoid arrest and prosecution.

pects emerge, *e.g., United States v. Watson,* 423 U.S. 411, 423–34, 96 S.Ct. 820, 827–33, 46 L.Ed.2d 598 (1976), or seek an arrest warrant from a neutral and detached magistrate. Naturally, if the suspects become aware of the surveillance—absent any bad faith conduct of the police [4]—then the situation may permit the immediate entry into the residence. *E.g., United States v. Johnson,* 660 F.2d 749, 753 (9th Cir.1981) (possibility that suspects would become aware of surveillance heightened dramatically with the arrival of a television news crew), *cert. denied,* 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982).

We note too that there are a few rare situations where the suspects' knowledge of their imminent capture is irrelevant to the exigency calculus. For example, the officers need not wait for a warrant if they reasonably believe that evidence is being currently removed or destroyed and it is impractical to advert the situation without immediately arresting the suspects or seizing the evidence. *E.g., United States v. Licata,* 761 F.2d 537, 544 (9th Cir.1985) (unless seized immediately, evidence contained in baggage being transported on aircraft could be lost even before it reached its destination); *United States v. Curran,* 498 F.2d 30, 35 (9th Cir.1974) (suspects were dispensing marijuana to couriers who then left in automobiles; under the circumstances it was impractical for the officers to stop each courier). Also, the officers need not wait for a warrant when they reasonably believe that a suspect is currently endangering the lives of themselves or others. *See, e.g., United States v. Echegoyen,* 799 F.2d 1271, 1278–79 (9th Cir. 1986) (officers reasonably feared possible explosion); *United States v. Good,* 780 F.2d 773, 775 (9th Cir.1986) ("The officers

reasonably could conclude that someone with Good had been seriously injured and that entry was necessary to assist the injured person."); *United States v. Al-Azzawy,* 784 F.2d 890, 894 (9th Cir.1985) (suspect was believed to be in possession of explosives and in such an agitated and violent state as to create a risk of endangering the lives of others), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *United States v. Brock,* 667 F.2d 1311, 1318 (9th Cir.1982) (immediate search of motor home necessary to avoid possible explosion caused by chemicals used in making methamphetamine), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983); *United States v. Mayes,* 670 F.2d 126, 128 (9th Cir.1982) (search required to deal with the life-threatening emergency of properly treating an injured child). We do not need to delineate here every example of where a suspect's lack of knowledge of his imminent capture does not vitiate the asserted exigency. We need only point out that such situations occur less often than when a suspect in fact knows or is in substantial danger of learning of his imminent capture. *See Flickinger,* 573 F.2d at 1355.

Undoubtedly the officers here reasonably believed that the nature of Appellant's crimes was indicative of his danger and, further, that he possessed evidence that he might destroy. But we cannot conclude on the record before us that the officers reasonably believed that Appellant either knew or was in substantial danger of learning of his imminent capture. Nor can we in good conscience conclude that, like the conduct of the officers in *Good, Echegoyen,* and *Licata,* the officers here reasonably believed that even absent that knowledge immediate entry [5] into Ap-

---

**4.** "Good faith means not acting with the intent improperly to circumvent the warrant requirement by purposefully precipitating a situation, 'through illegal conduct,' in which the destruction of evidence or contraband is likely." *United States v. Kunkler,* 679 F.2d 187, 191 n. 3 (9th Cir.1982) (quoting *United States v. Allard,* 634 F.2d 1182, 1187 (9th Cir.1980)); *see, e.g., United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985) (the agents' fear for their safety was created by their initial warrantless entry); *United States v. Curran,* 498 F.2d 30, 34 (9th Cir.1974) ("Knowing that marijuana was present and knowing

that [by knocking on the front door] they would make their presence known to the occupants, the officers consciously established the condition which the government now points to as an exigent circumstance.").

**5.** The government also argues that the warrantless entry into Appellant's apartment was justified by the so-called doctrine of "hot pursuit." *See Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967). Even assuming that this doctrine enjoys an existence separate from the exigency analysis dis-

pellant's apartment was necessary to prevent him from either currently endangering lives or currently destroying evidence. *See Allard*, 600 F.2d at 1304 (entry "cannot be justified solely because an agent knows that there is contraband on the premises"). We believe instead that the officers could have conducted surveillance of the premises and either awaited Appellant's exit to effect a valid public arrest or, at minimum, make a good faith attempt to obtain an arrest warrant.

The government apparently argues that by the time the officers could have obtained an arrest warrant Appellant would have grown suspicious and therefore would have resorted to desperate measures. But we cannot measure the exigency of the circumstances by what might have happened in the interim period. The totality of the circumstances, viewed at the *moment* the police decided to enter Appellant's apartment, do not warrant a finding of exigency. Further, we have held several times before, on remarkably similar facts, that the police cannot avoid the good faith requirement of attempting[6] to obtain an arrest warrant because of an imagined delay. *E.g., Alvarez*, 810 F.2d at 883 & n. 6; *Blake*, 632 F.2d at 734. For these reasons we conclude that Appellant's warrantless arrest in his apartment was not excused by exigent circumstances and consequently was effected unlawfully.[7]

### 2

Our conclusion that Appellant was arrested unlawfully does not end our analysis of whether his voluntary consent to the search of his home and automobile was rendered ineffective. *See United States v. Wellins*, 654 F.2d 550, 552–53 (9th Cir. 1981). We must also consider whether his unlawful arrest "tainted" that consent. *See United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299 (9th Cir.1988). We have already established that Appellant's consent was voluntarily given for purposes of the fifth amendment. But for purposes of the fourth amendment exclusionary rule that determination only satisfies a threshold requirement. *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248,

cussed in the text, we would be remiss if we held that under these circumstances the officers were in "hot pursuit" of Appellant when they entered his home. There is no more of an element of a chase involved in this case than any preceding us. *E.g., United States v. Salvador*, 740 F.2d 752, 758 n. 5 (9th Cir.1984) ("pursuit of appellants was not immediate or continuous from the scene of the crime" and therefore there was no "hot pursuit"), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *Dorman v. United States*, 435 F.2d 385, 393 (D.C.Cir.1970) (tracing of suspect through investigative processes is not a case of hot pursuit, "unless that term is to be stretched beyond all reasonable meaning"). If *United States v. Scott*, 520 F.2d 697 (9th Cir.1975), *cert. denied*, 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976), suggests otherwise, it no longer remains good law. *Compare id.* at 700 (police who through investigative processes had traced suspects to an apartment building had engaged in "hot pursuit") *with Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 2091, 80 L.Ed.2d 732 (1984) (under circumstances where policemen traced suspect to his home, "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime").

**6.** We view Officers Fowks's and Kartinen's admissions that they have *never* attempted to obtain a telephonic warrant and consequently do not know how one can be obtained as a shocking reminder of the apparent disuse of the procedure outlined in Fed.R.Crim.P. 41(c)(2). Such an excuse hardly justifies lack of compliance with the dictates of the fourth amendment. *See Alvarez*, 810 F.2d at 883.

**7.** This resolution in Appellant's favor obviates any need to decide his related contention that the officers' failure to comply with state and federal knock and announce requirements also means that his arrest was effected unlawfully. *See* 18 U.S.C. § 3109 (1982); Cal.Pen.Code § 844 (West 1988). Although compliance with these statutes, too, can be excused for exigencies, *see Ker v. California*, 374 U.S. 23, 37–41, 83 S.Ct. 1623, 1631–34, 10 L.Ed.2d 726 (1963), a distinct analysis is still necessary because they determine *how* an entry can be made rather than *when* it can be made, *see Bustamante–Gamez*, 488 F.2d at 9–12. Thus, while an exigency may not exist to justify an immediate entry into a home, once that entry is justified legitimate concerns may arise for taking the suspect by surprise. *E.g., United States v. Ramirez*, 770 F.2d 1458, 1460 (9th Cir.1985) ("A police officer's 'reasonable belief that announcement might place him or his associates in physical peril ... constitutes exigent circumstances that justify noncompliance with the announcement provisions of the statute.'" (quoting *Manfredi*, 722 F.2d at 524)).

2259, 60 L.Ed.2d 824 (1979). We must also consider three additional factors: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct. . . ." *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975) (footnotes omitted).

■■■ "The first two factors go primarily to the question whether an illegally arrested or detained defendant's response to police questioning is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" *United States v. Perez–Esparza,* 609 F.2d 1284, 1289 (9th Cir.1979) (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). These two factors clearly tip in Appellant's favor. As best we are aware, no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours. *E.g., Perez–Esparza,* 609 F.2d at 1290 (three-hour interval). Here, Appellant's consent to search followed his illegal arrest by no more than one hour. Nor are there any intervening circumstances here. True, Appellant was transported away from his apartment and to a nearby hospital to be treated for his injuries. But the investigating officers who questioned him while he was there and the state of his physical condition at that time could not have made that environment any less coercive than being transported to the local station house for questioning. This simply is not a case where Appellant had been released from custody, made an appearance before a magistrate, or consulted with an attorney, *see Delgadillo–Velasquez,* 856 F.2d at 1300, such that we would be able to say that his consent to search was an "unconstrained, independent decision" that was completely unrelated to his initial unlawful arrest, *Perez–Esparza,* 609 F.2d at 1289.

The last of the three factors, "the purpose or flagrancy of the official misconduct," is "particularly important" because it comes closest to satisfying "the deterrence rationale for application of the exclusionary rule." *Id.* This factor has been decisive most often in those cases where police officers did not have probable cause to effectuate an arrest, but instead took a suspect into custody hoping that an interrogation would yield incriminating statements. *E.g., Brown,* 422 U.S. at 604–05, 95 S.Ct. at 2262–63; *cf. United States v. Howard,* 828 F.2d 552, 556 (9th Cir.1987) (Because lack of probable cause made entry into a residence illegal, "Mrs. Angel's subsequent consent to search the premises after the officers had entered the home was tainted and therefore invalid."). We do not face that situation here. The police had probable cause to arrest Appellant; the purpose of unlawfully arresting him obviously was not to build a case against him. But "[t]he manner in which the arrest takes place must also be considered." *Delgadillo–Vellasquez,* 856 F.2d at 1300. Here, the "flagrancy" of the officers' conduct in rushing into Appellant's apartment, with guns drawn and ready to "do battle," persuades us that this third factor does not weigh sufficiently against Appellant to overwhelm the other two factors that weigh so clearly in his favor. *See id.; see also United States v. Johnson,* 626 F.2d 753, 758–59 (9th Cir.1980) (first two factors warranted exclusion of inculpatory statements even though third factor did not apply), *aff'd,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). We hold that the district court erred when it found that Appellant's consent to the search of his apartment and automobile was effective for purposes of the fourth amendment.[8]

8. In so holding we realize that the Supreme Court recently granted certiorari in a case applying the fruit of the poisonous tree doctrine to circumstances where the police had probable cause to arrest a defendant even though they did so in his home and without a warrant. *See People v. Harris,* 72 N.Y.2d 614, 532 N.E.2d 1229, 536 N.Y.S.2d 1 (1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1741, 104 L.Ed.2d 178 (1989). For now our decision is controlled by cases such as *Johnson,* which do not emphasize the need for a particularized, direct causal connection between the officers' warrantless arrest of a defendant in his home and the defendant's subsequent statements. Although we suspect that the Court's upcoming decision in *Harris* may change the law in this area, we need not anticipate that change as we affirm Appellant's conviction on the basis of his wife's consent to the search.

## B

Appellant argues that the search of his apartment and automobile cannot be sustained on the basis of his wife's consent either. The general rule is that a consent to search obtained from third persons is effective if they possess "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). " 'Common authority' rests on mutual use of the property by those generally having joint access or control so that it is reasonable to recognize that any of the parties has the right to permit inspection and others have assumed the risk that the third parties might consent to the search." *United States v. Yarbrough*, 852 F.2d 1522, 1534 (9th Cir.1988), *cert. denied*, ── U.S. ──, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). The district court found, and we have no reason to question, that Appellant's wife possessed common authority over both the apartment and automobile. Appellant argues, however, that the district court erred in finding as a matter of fact that his wife's consent actually preceded the searches. Whereas the police officers testified that the searches did not occur until after she signed a consent to search form, Appellant's wife testified that she signed the consent to search form only after the searches were either completed or nearly completed. We do not believe it was error for the district court to resolve this credibility dispute against Appellant. *See United States v. Rodriguez*, 869 F.2d 479, 486 (9th Cir.1989). It is true that the police officers were inside the apartment when Appellant's wife returned from work. But that fact alone does not convince us that the search was in progress. The police are permitted to secure a residence from the inside while waiting for proper permission to conduct a search. *See Segura v. United States*, 468 U.S. 796, 811, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984). Appellant has not presented any facts beyond that to persuade us that the district court committed clear error when it concluded that Appellant's wife effectively consented to the search of his apartment and automobile for purposes of the fourth amendment.

## C

Even if we agreed that Appellant's wife's consent was ineffective, we still would be compelled to affirm Appellant's convictions. There is little doubt that the officers had probable cause to suspect that Appellant's automobile contained contraband. His automobile was still warm from being recently driven on a day that Appellant was known to have committed at least two bank robberies. Under such circumstances a reasonable officer would suspect that the vehicle not only was used in the robberies, but that it still contained the fruits of those crimes. That is all that is needed to sustain the warrantless search of an automobile. *See United States v. Johns*, 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985) ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search.").

Appellant's convictions could be sustained on the basis of the evidence seized from the automobile alone. At trial the jury was allowed to consider various evidence that included fingerprints lifted from several locations, a large amount of cash, and two handguns. They also considered the testimony of several witnesses who identified Appellant as the perpetrator of the crimes. Only a small portion of the cash and one of the two handguns was recovered from Appellant's apartment. " '[I]t is clear beyond a reasonable doubt that if the jury had not considered' the tainted evidence 'its verdict would have been the same' " based on the remaining, overwhelming evidence of his guilt. *LePage v. Idaho*, 851 F.2d 251, 253 (9th Cir.) (quoting *Pope v. Illinois*, 481 U.S. 497, 503 n. 6, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987), but mistakenly attributing "not considered" to *Pope*), *cert. denied*, ── U.S. ──, 109 S.Ct. 506, 102 L.Ed.2d 542 (1988).

**1418**

### III

■ Only two issues remain for our consideration and neither merits much discussion. Appellant argues that the district court erred in quashing a Fed.R.Crim.P. 17(c) subpoena he caused to be issued shortly after trial began. The subpoena was directed to the FBI and sought extensive information for all bank robberies occurring in Orange County between December 25, 1986, and July 10, 1987. A subpoena such as this one, however, is "not intended to provide a means of discovery for criminal cases." *United States v. Nixon,* 418 U.S. 683, 698, 94 S.Ct. 3090, 3102, 41 L.Ed.2d 1039 (1974). Apparently this is the purpose Appellant's counsel had in mind because at the hearing on the government's motion to quash he conceded that the subpoena was "overly broad" and that it had the "earmarks of a wild goose chase." When counsel revealed that all he really sought was information on the use of the phrase, "tell the cops the Orange County kid was here," the government replied that it had no documents responsive to that request. We hold that under these circumstances the district court did not abuse its discretion in granting the government's motion to quash. *See id.* at 702, 94 S.Ct. at 3104. Appellant's argument that this material was essential to the preparation of his defense and therefore was required to be produced under Fed.R.Crim.P. 16(a)(1)(C) and the *Brady* rule is equally unavailing.

■ Appellant also argues that the district court improperly deemed the defense to have rested its case after exhausting all its witnesses. Appellant's argument is unconvincing. The district court warned both parties before trial began that they could expect their cases to be considered completed at the time they ran out of witnesses. This admonition does not run afoul of Rule 57 of the Federal Rules of Criminal Procedure, which allows district courts wide latitude in regulating the progress of criminal trials. Nor does the application of the Rule under the circumstances here violate Appellant's fifth amendment right to a fair trial. The witnesses that Appellant wanted to call would not have helped his defense. Appellant had already sought unhelpful ex-culpatory identification testimony from other robbery witnesses; equally unhelpful would have been the testimony of a fingerprint expert who would have only corroborated the findings of the government's own expert. The district court did not abuse its discretion by limiting Appellant's right to solicit testimony from these witnesses.

### IV

Even though Appellant was arrested unlawfully and his consent to the search of his apartment and automobile was thereby tainted, we uphold the district court's denial of his motion to suppress because his wife's consent was sufficient to excuse the warrantless searches. Also, the district court did not err when it quashed the subpoena or when it deemed Appellant's case closed after he ran out of witnesses. Appellant's convictions are AFFIRMED.